UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES,

                              Plaintiff,

                                                    **MEMORANDUM,**
                                                    **OPINION** and **ORDER**

                    - against -                     05-CR-128 (TCP) (ARL)

PESCATORE,
                              Defendant.
-------------------------------------------------------------X
PLATT, District Judge:

          Defendant Michael Pescatore moves this Court for the following

relief:

          (a) reassign this case to another court because Defendant alleges
          the Government engaged in "prosecutorial judge shopping";

          (b) recuse itself because this Court's spouse owns stock in the
          Allstate Insurance Company and the Hartford Insurance Company,
          two putative victims of the alleged chop-shop conspiracy
          prosecuted in *United States v. Astra Motors*, 04-CR-774 ("the
          Astra criminal case");

          (c) suppress all evidence and fruits of evidence obtained from the
          search of the Astra Motors premises;

          (d) sever certain counts of the indictment pursuant to Fed. R. Crim.
          P. ("Rule") 8(a) and Rule 14;

          (e) grant Defendant a bill of particulars; and

          (f) grant Defendant's discovery requests.

          For the following reasons, Defendant's discovery requests are

**GRANTED in part and DENIED in part.**  Defendant's remaining motions are

**DENIED**.

# BACKGROUND

*I. The Related Cases*

This Court has recently written on a motion for reassignment in a related case. *See United States v. Astra Motors Cars*, *et al.*, 352 F. Supp. 2d 370 (E.D.N.Y. 2005). The Court presumes familiarity with the decision.

As a preliminary matter, this Court notes that on December 24, 2003, the United States filed a complaint which sought forfeiture of various properties owned by some of the Astra Motors co-defendants ("the Astra civil case"). This civil case was designated CV 03-6456 and randomly assigned to this Court. This was the first action taken by the U.S. Government in this case. As will be described below, all activity preceding the commencement of the Astra civil case occurred at the state level or in an unrelated federal case.

In January 2003, in connection with a state investigation into car theft activities run by the Suffolk County Police Department ("SCPD"), search warrants were executed at the homes of Frederick Lebron and Thomas Reek. (Gov. Opp. Reassignment, Nov. 9, 2005 ("Gov. Opp. R.") at 4.) The search recovered stolen car parts and two handguns. (Lefcourt Decl. Supp. Def.'s Omnibus Mot. ("Lefcourt Decl.") ¶ 25.) On February 21, 2003, Lebron and Reek were indicted in Suffolk County Court on charges of *inter alia* forgery and criminal possession of stolen property. (Lefcourt Decl. ¶ 26.)

On June 17, 2003, also as a result of the SCPD investigation, a State Court issued a warrant authorizing police to search the premises of Astra

Motors, Inc. ("Astra Motors", "Astra", or "the company"), an automobile business located at 455 Morgan Ave, Brooklyn, New York. *See infra* Background pt. II (describing in detail the search of the Astra premises).

On June 27, 2003, a complaint was filed against Frederick Lebron in the United States District Court for the Eastern District of New York, charging him with being a felon in possession of a firearm ("the Lebron gun case"). The case was randomly assigned to the Honorable Arthur D. Spatt. On November 3, 2003, Lebron was indicted on the gun charge. (Lefcourt Decl. ¶ 37, Gov. Opp. R. at 4.)

The complaint in the Lebron gun case was drafted by Assistant United States Attorney Robert P. LaRusso, who also appeared at Lebron's arraignment. Mr. LaRusso later left the U.S. Attorney's office and entered private practice, where he began representing Astra Motors. The Government objected to his representation because of his earlier involvement in the Lebron gun case. The Executive Office for United States Attorneys (EOUSA) instituted a lifetime ban prohibiting him from participation in the Astra matter. (Lefcourt Decl. ¶¶ 43-48; Gov. Opp. R. at 6.)

As noted above, in December 2003 the Astra civil case was filed in this Court. On February 3, 2004, a criminal complaint was filed in the United States District Court for the Eastern District of New York, alleging that Lebron and Reek conspired to operate a "chop shop," in violation of 18 U.S.C. § 2322 ("the Lebron chop shop case"). On March 2, 2004, Lebron and Reek were

indicted and the case was improperly assigned to Judge Spatt, who was presiding over the firearms case against Lebron. (Lefcourt Decl. ¶ 51; Gov. Opp. R. at 5.)

On April 21, 2004, John McConnell was charged in a four count indictment alleging interstate transportation of stolen motor vehicles and tampering with Vehicle Identification Numbers ("VINs"). *United States v. McConnell*, 04-CR-383 was improperly assigned to the Honorable Sandra J. Feuerstein. Also on April 21, 2004, Robert Morris was charged with the same crime. *United States v. Morris*, 04-CR-382 was improperly assigned to the Honorable Joanna Seybert. (Lefcourt Decl. ¶¶ 64-72; Gov. Opp. R. at 5.)

On August 25, 2004, the Astra criminal case was indicted. The Defendant, Morris, McConnell, and others were charged with an elaborate chop shop scheme. By a letter dated September 9, 2004, the Government properly requested this Court relate the Astra criminal case to the Astra civil case already pending before the Court. (Def.'s Aff. ¶ 81; Gov. Opp. R. at 6.) On September 13, 2004, the Government sent letters to Judges Feurstein and Seybert requesting *United States v. McConnell* and *United States v. Morris* be transferred to the this Court. (Gov Opp. R. at 6.) Defendant McConnell objected to the assignment under the Guidelines for Division of business among District Judges (the "Guidelines"). On January 14, 2005, this Court issued the opinion in *Astra Motor Cars*, 352 F. Supp. 2d 370. The Court held that the three criminal cases (the Astra criminal case, *United States v. Morris*, and *United States v. McConnell*) were all related to the Astra civil case and should proceed in this Court. The

Court also held the Guidelines did not give the Defendants any right to litigate where a particular case would be tried. *Astra Motors Cars*, *et al.*, 352 F. Supp. 2d at 372.

On February 22, 2005 the Government filed an indictment in this case (05-CR-128) charging the Defendant, Michael Pescatore, with *inter alia* four counts of Hobbs Act Extortion in violation of 18 U.S.C. § 1951(a) ("the extortion case").[1]

The Defendant objects to the assignment of the Astra Motors cases and the extortion case to this Court. Defendant recognizes that this Court has already written on this matter but asserts that new information has become available which should alter the Court's decision. These arguments shall be addressed in Section I of the Discussion. (Lefcourt Decl. ¶¶ 4-8.)

## II. *The Search of the Astra Motors Premises*

In January 2003, the SCPD commenced an investigation into Astra Motors. The investigation was headed by Detective ("Det.") Robert Petro of the SCPD, an officer with seventeen (17) years experience in the Police Department.

In June 2003, Det. Petro submitted an application for a warrant (the "application") to search the Astra Motors premises to Judge Bergstrom of the Suffolk County First District Court. (Gov. Mem. Opp. Def.'s Omnibus Mot. ("Gov. Mem. Opp.") at 3.) In the application, Det. Petro stated that his

---

[1]　Pescatore is also a Defendant in the Astra criminal and civil cases.

investigation had revealed that Michael Pescatore and others were involved in the purchase and sale of stolen vehicles and vehicle parts through Pescatore's dealership, Astra Motors. (Sercarz Decl. Supp. Def.'s Omnibus Mot. ("Sercarz Decl."), Ex. 3 ("Warrant Application"))  Det. Petro based his conclusions on an extensive review of documents, witness interviews, and the careful examination of vehicles purchased by Astra Motors.

Det. Petro examined three of these vehicles as a result of a search warrant executed on January 24, 2003:  a 2001 Mercedes Benz, a 2002 Chevrolet Avalanche, and a 2001 Cadillac Deville.  When these vehicles were purchased by Astra, they had been theft stripped of their major component parts.  Upon execution of the search warrant, Det. Petro observed these cars reassembled with their original stolen parts. (Warrant Application ¶ 8.)  Det. Petro then conducted a check of these three vehicles with the New York State Department of Motor Vehicles ("NYSDMV"), which showed that no paperwork had been generated or recorded by Astra Motors to document the transfer of these vehicles to the individuals from whom they were seized.  Det. Petro used informants to corroborate his well-founded suspicion that Astra Motors was involved in a criminal scheme that involved the acquisition and reassembly of stolen cars, and the generation of fraudulent paperwork to conceal the scheme. (*See* Warrant Application ¶ 8.)

On June 3, 2003, Det. Petro examined two 1998 Infiniti I-30s which had been purchased by Astra Motors on or about August 9, 2000.  When

purchased by Astra, the vehicles were missing their interiors, including the dashboards, which had the vehicles' VIN tags attached to them. When Det. Petro observed the vehicles, they had been completely reassembled, including the missing dashboards and original VIN tags. (Warrant Application ¶¶ 9-10.) Det. Petro correctly found that probable cause existed to believe that Astra Motors had the stolen parts in their possession when it purchased the vehicles. (Gov. Mem. Opp. at 4.) After Det. Petro filed the application for the search warrant, he spoke with Danny Villagran, the purchaser of one of the Infinitis. Villagran offered an innocent, though highly improbable, explanation for the reappearance of the stolen parts. Villagran stated that he had found the dashboard with the VIN tag in the trunk of the car and reinstalled it himself. (Adelman Decl. Supp. Def.'s Omnibus Mot. ("Adelman Decl.") ¶¶ 39-40.)

Another vehicle Det. Petro examined was a 2002 Cadillac Escalade, which he impounded on June 5, 2003. Det. Petro initially observed the vehicle when it was brought to a NYSDMV examination site for inspection and titling. The Cadillac had Astra Motors dealer plates attached to it. Det. Petro stated that the Cadillac was brought to the site by an Astra Motors employee, although Defendant disputes this assertion. (Warrant Application ¶ 11.) The purported employee brought the vehicle for inspection on behalf of one Gerald Lane, an Astra customer, and had with him an invoice that memorialized the sale to Lane. Det. Petro later learned that Lane had been deceased since 1994. Det. Petro also learned, through the National Crime Information Center, that the

Cadillac had an active alarm, indicating that the vehicle was probably stolen, although Defendant also disputes this assertion. Based on these discoveries, Det. Petro concluded that probable cause existed to believe Astra Motors filed false documents with the NYSDMV. (Warrant Application ¶ 11.)

Aside from evidence gathered from the examination of vehicles, the warrant application also included information demonstrating that Astra Motors failed to remit approximately $125,258.27 in sales taxes to the New York State Department of Taxation and Finance (the "Tax Department"). (Warrant Application ¶ 12.) Investigators from the Tax Department reached this conclusion after reviewing Astra Motors MV-50 forms, which include specific vehicle information such as sale price. (Gov. Mem. Opp. at 5.) Investigators found that the selling prices listed on Astra's MV-50s were considerably lower than the fair market value of the makes and models sold, although Defendants dispute this finding. Based on these findings, Det. Petro concluded that the Defendant underreported his tax liability. (Warrant Application ¶ 12.)

On June 13, 2003, Judge Bergstrom signed the warrant application. The search warrant authorized officers and agents to search *inter alia* the following locations:

> (i) the building and yard of Astra Motors located at 455 Morgan Avenue, Brooklyn N.Y.;
>
> (ii) inside of motor vehicles possessing the dealer license plates and/or dealer assignment plates of Astra Motors and Astra Motor Cars; and

           (iii) inside of motor vehicles located within 455
           Morgan Avenue.

(Warrant Application ¶ 1.)

       The warrant authorized *inter alia* the seizure of the following

items:

           (i) certain property which constitutes evidence of a
           crime, [or] constitutes proceeds of a crime;

           (ii) customer files and files kept in the course of
           Astra Motors' business detailing the purchase and
           sale and origin of automobiles;

           (iii) US Currency, money orders, bank records,
           checks, safety deposit box keys, evidence evincing
           ownership and control of the premises; and

           (iv) Motor vehicles including documents, parts
           related but not limited to the following cars[2]:

           a.  2001 Mercedes
           b.  2002 Chevrolet Avalanche
           c.  2001 Cadillac Deville
           d.  2002 Cadillac Escalade
           e.  1998 Infiniti I30
           f.  1998 Infiniti I30

(Warrant ¶ 2.)

       On June 17, 2003, law enforcement personnel from various

agencies executed the search warrant at the Astra Motors' premises.  The Astra

building has two floors.  On the second floor, officers located a bathroom, two

storage rooms, and two offices. (Gov. Mem. Opp. at 5.)  Defendant argues that he

---

[2]  The warrant included the vehicles' VIN numbers.

used one of these offices only for his real estate businesses. (Sercarz Decl. ¶ 6.) However, officers observed no conspicuous sign indicating that businesses other than Astra were operating in the building, nor did they observe a separate entrance to the second floor office. (Gov Mem. Opp. at 8-9, 24.)

The search recovered 18 automobiles, numerous automobile parts, 6 computers, approximately $9,000 and 89 boxes containing records. (Gov. Mem. Opp. at 9.) Defendant argues the that the evidence obtained in the search should be suppressed. These arguments will be addressed in Section II of the Discussion.

III. *The Extortion Charges*

In an investigation conducted separately from the search of the Astra premises, SCPD asset forfeiture detectives attempted to trace the proceeds of the crimes allegedly committed by Astra Motors. (Gov. Mem. Opp. at 9.) During the course of their investigation, the detectives allegedly discovered that Defendant and his associates had committed extortion against a number of individuals. Detectives learned of one individual named Ted Doukas, who leased the Defendant a storefront in the Harborview Shopping Center. During an interview, Doukas stated that the Defendant had demanded Doukas pay him rent refunds. When Doukas refused to make payment, the Defendant threatened him and told Doukas his "accountants" were going to speak to him. As a result of

these threats, Doukas paid Defendant approximately $15,000 over a number of years. (Gov. Mem. Opp. at 9, 12.)

Authorities also found reason to believe that Defendant had extorted three contractors who had worked on his house. Detectives learned that a $38,000 mechanics lien had been filed against Defendant's residence by James Deriso, the owner of Greenscapes Landscaping. During an interview, Deriso told detectives that he had agreed to perform landscaping services for Pescatore in May 2001. A dispute then arose over outstanding bills and Deriso filed the mechanics lien. Deriso stated that Pescatore and his associates verbally threatened him and as a result, he withdrew the lien and settled with Defendant for far less than he was owed. (Gov. Opp. Mem. at 9-10.)

Another contractor detectives spoke to was Vincent Mutarelli, who had constructed the gates around Defendant's residence. Mutarelli reported that Pescatore extorted a substantial amount of money from him after a dispute arose concerning the work he had completed. (Def.'s Mem. at 10, 13.)

As part of a criminal tax investigation, IRS special agents learned of another victim named Michael Simon, an interior designer who had decorated Defendant's home. Simon told authorities that Defendant had committed extortionate acts to recover a $50,000 retainer that the Defendant had paid to him. (Def.'s Mem. at 11-13.)

The initial indictment in the extortion case was filed on February 22, 2005. On September 14, 2005, a superseding indictment was filed which

added new counts and a new defendant, Byron Chavis.  The superseding

indictment charged that Chavis and Pescatore had together and separately

engaged in a series of extortionate acts.[3]  The counts pertaining solely to Chavis

were later effectively severed by a disposition in that case.  Defendant argues that

certain of the remaining counts should be severed.  These arguments will be

addressed in Section III of the Discussion.


## DISCUSSION

### I.  Reassignment and Recusal

A.  *Reassignment Due to Alleged Government Misconduct*

Defendant objects to the assignment of the Astra criminal case and

Pescatore extortion case to this Court.  Defendant argues that the Government

engaged in "prosecutorial judge shopping" by omitting certain cases from the

letter filed with this Court on September 9, 2004, which requested the Astra civil

and criminal cases be related.  Defendant contends that had the cases been listed,

the Astra criminal case would have been assigned to another court. (Lefcourt

Decl. ¶¶ 4-8.) Defendant is wrong.

1.  The Basis for the Motion

As noted above, the assignment of cases in this District are

governed by the Guidelines for Division of Business among District Judges,

which were adopted pursuant to 18 U.S.C. § 137.  The preamble to the Guidelines

---

[3]     Counts one, two, and three charged Michael Pescatore alone.  Counts four, five, and nine charged
Byron Chavis alone.  Counts six, seven, and eight charged both Chavis and Pescatore.

prominently states: "These rules are adopted for the internal management of the caseload of the court and shall not be deemed to vest any rights in litigants or their attorneys . . . ."  Furthermore, as this Court has repeatedly made clear, "these rules are not intended to give the parties a right to litigate where a particular case will be tried, but merely provide the guidelines by which the Eastern District administratively handles and assigns its cases." *United States v. Astra Motors Cars*, *et al.*, 352 F. Supp. at 372 (quoting *United States v. Garces*, 849 F. Supp. 852, 861 (E.D.N.Y. 1994).

   Defendant argues that he has a right to sue pursuant to 18 U.S.C. § 137 because under that statute the Chief Judge has a statutory obligation to enforce the rules of the District Court. (Def.'s Omnibus Mot. ("Def.'s Mot.") at 10.)  However, the statute does not explicitly grant defendants a right to sue under a Court's Local Rules, nor does the Defendant point to any case law finding such a right.  In fact, federal courts have repeatedly held the opposite. *See U.S. v. Keane*, 375 F. Supp. 1201, 1204 (N.D. Ill. 1974) ("[A] defendant has no vested right to have his case tried before any particular judge, nor does he have the right to determine the manner in which his case is assigned to a judge."); *Board of School Directors of City of Milwaukee v. State of Wisconsin*, 102 F.R.D. 596, 598 (E.D. Wis. 1984) ("[A]ssignment of cases does not give or deny any litigant any due process rights; even a criminal defendant has no due process rights in assignment of his case.")  Thus, the Defendant has no basis to make the current motion and it is denied.

Furthermore, even if Defendant had a legal basis, this Court would deny his motion because the Astra civil and criminal cases and the extortion case were properly assigned to this Court.

## 2. Case Assignment

The Defendant alleges that the Government improperly steered the Astra Motors criminal case to this Court by deliberately omitting four related cases from the Sep. 9, 2004 letter. The omitted cases are the Lebron gun case, the Lebron chop shop case, *United States v. McConnell*, and *United States v. Morris*. Under the local rules, related cases in different courts will be reassigned to the Judge overseeing the case which was filed earliest. *See* Local Rule 50.3(e) ("Related cases shall be assigned by the clerk to the judge to whom was assigned the case with the lowest docket number in the series of cases.") This Court has already held that the Astra criminal case is related to the Astra civil case. *See Astra Motors Cars*, *et al.*, 352 F. Supp. 2d at 373. Thus, the Government's omission of the *Morris*, *McConnell*, and Lebron chop shop cases, which were all filed after the Astra civil case, is irrelevant. Had the Government indicated that these cases were related, the Astra Motors criminal case would still have been assigned to this Court because the civil case was filed before these three cases.

The only case filed earlier than the Astra civil case is the Lebron gun case (not the chop shop case), and thus Defendant's argument turns on whether the Astra civil case should have been related to the Lebron gun case.

Under the local rules, criminal and civil cases will be related when "because of the similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of judicial resources is likely to result form [sic] assigning both cases to the same judge and magistrate judge." Local Rule 50.3(a). Under this standard, the civil case and the Lebron gun case are clearly unrelated. Lebron's possession of firearms is not relevant to the forfeiture of Astra Motors' assets. Indeed, the guns themselves had no tie to the business of Astra Motors. The fact that Lebron was later charged in a chop shop case that may relate to the Astra Motors cases does not make the gun case any more related. Thus, the Government acted properly in omitting the Lebron gun case from the information sheet.[4]

Defendant points to three grounds which he believes show a relationship between the civil case and the Lebron gun case. First, Defendant argues that the cases arose from the same investigation by the SCPD. (Lefcourt Decl. ¶ 16.) However, the fact that cases involve a similar starting point is insufficient for relating them if other issues do not overlap. *See American Direct Marketing, Inc. v. Azad Intern., Inc.*, 783 F. Supp. 84, 87 -88 (E.D.N.Y. 1992) (holding that two civil cases were not related under Local Rule 50.3 where cases involved trade infringement of the same product, but all other legal and factual issues raised were different).

---

[4] As this Court has found that the Government did not engage in "judge shopping", it need not address Defendant's lengthy argument concerning the "prejudice" and "appearance of impropriety" which resulted from the Government's alleged misconduct.

Second, Defendant argues that the opinion by the EOUSA, which permanently banned the Assistant United States Attorney on the gun case from representing defendants in the Astra criminal case demonstrates that the two cases are related. (Lefcourt Decl. ¶¶ 37-50.)  However, the rationale for the lifetime ban is distinct from the rationale for Local Rule 50.3.  The ban was imposed for fear that the prosecutor might have confidential or privileged information which could prejudice legitimate government interests. *See Woods v. Covington County Bank*, 537 F.2d 804, 816 (5th Cir. 1976) (holding that prosecutors who leave public office may be barred from private representation of certain clients because of the knowledge they gained as Government attorneys).  Such a finding does not imply the cases were "related" under the internal case management rules of the Eastern District.

Lastly, Defendants argue that the case should be reassigned because an Assistant United States Attorney allegedly used the potential assignment of the Astra criminal case to this Court "as a sword [in] the plea bargaining discussions that preceded the indictment." (Transcript of Record, *U.S. v. Pescatore*, 05-CR-128, Dec. 2, 2005, ("Tr.") at 21)  This argument may be briefly refuted.  First, the Government disputes this allegation and there is no transcript of these discussions before the Court.  Second, Defendant points to no case or statute that allows for reassignment on this basis.  Lastly, the Assistant may not be criticized for predicting that the case would be assigned to this Court when that prediction was absolutely correct.

In sum, the Defendant's "new information" concerning the Government's omissions does not alter this Court's decision that the Astra criminal case and Astra civil cases are related and were properly brought before the Court. Accordingly, this Court denies Defendant's motion for reassignment and denies Defendant's request for a hearing on the issue.

B. *Recusal based on Stock Ownership by this Court's Spouse*

Defendant brings a motion for recusal, pursuant to 25 U.S.C. § 455(a and b), based on the Court's spouse's ownership of stock in two insurance companies that may be subject to claims of the victims in the Astra criminal case. (Def.'s Mot. at 9.) As a threshold matter, there is some dispute over whether this motion should have been brought in the Pescatore extortion case, as this case does not involve car theft or automobile insurance. Defense counsel argues that recusal is a relevant issue here because (i) the extortion case would likely be reassigned if this Court is recused from the Astra criminal case on the basis of its stock ownership, and (ii) making separate motions for recusal in the Astra criminal case and the extortion case would open counsel up to the accusation of making motions *seriatim* . (Def.'s Reply Supp. Mot. Recuse, Dec. 9, 2005.) This Court finds merit in defense counsel's concerns and has decided to rule on the motion in the extortion case.

Defendant brings his motion pursuant to sections 455(a) and (b)(4) of Title 28. Section 455(a) disqualifies any judge of the United States "in any

proceeding in which his impartiality might reasonably be questioned." Section 455(b)(4) mandates recusal *inter alia* when a judge or the judge's spouse has "a financial interest in the subject matter in controversy or in a party to the proceeding . . . ." The Second Circuit has held that while even a judge's *de minimus* interest in a party will be grounds for automatic recusal, the same is not true of a judge's *de minimis* interest in a non-party. *See United States v. Laurensen*, 348 F.3d 329, 336 (2d Cir. 2003) *vacated on other grounds* 125 S.Ct. 1109 (2005). Here, Defendant does not allege that the Court owns stock in a party, but rather his spouse owns stock in companies that may have insured victims of the alleged crimes. This claim is far too attenuated to serve as a basis for automatic recusal under Section 455.

Indeed, the claim is too attenuated to serve as a basis for recusal at all. The Second Circuit laid down the relevant standard for recusal in cases involving a judge's interest in a crime victim in the *Laurensen* case.

> [W]e decline to adopt a *per se* rule requiring recusal in every instance where a judge has an interest in the victim of a crime. Instead, we believe that recusal is required only where the extent of the judge's interest in the crime victim is so substantial, or the amount that the victim might recover as restitution is so substantial, than an objective observer would have reasonable basis to doubt the judge's impartiality.

*Id.* at 336-37.

There is no doubt that this Court's interest is insubstantial. The Court's spouse owns 80 shares of stock in the Hartford Insurance Company

("Hartford") and about 1,000 shares in Allstate Insurance Company ("Allstate"). (Transcript of Record, *U.S. v. Pescatore*, 05-CR-128, Nov. 10, 2005 at 15.)  In Allstate's last quarterly report, the company had 648 million shares of stock outstanding.  Thus, stock owned by the Court's spouse constitutes 0.00015 percent of outstanding shares.  As of February 15, 2005, Hartford had 295 million shares of stock outstanding.  Thus, stock owned by the Court's spouse constitutes 0.000027 percent of the outstanding shares. (Gov. Mem. Opp. Recusal, Nov. 21, 2005, "Gov. Mem. Opp. Recusal" at 5.)  Similarly, the amount the victim may recover as restitution from Defendants is insubstantial.  The Government has averred that currently Allstate is entitled to $80,000 in restitution and Hartford is entitled to $10,000.  For various reasons, the Government "estimates that Allstate and Hartford's restitution amounts will not increase significantly in any event." (Gov. Mem. Opp. Recusal at 8.)  Considering that Allstate and Hartford have annual revenues of approximately $30 billion, the amount of restitution for both companies is clearly insubstantial, as Defendant concedes. (Def.'s Reply Supp. Mot. Recuse, Dec. 9. 2005.)  Accordingly this Court denies Defendant's motion for recusal.

## II. Suppression

As requested by the Defendant at oral argument, the Court in this Memorandum and Order rules on all suppression arguments made by counsel for the Defendant in both the extortion case (05-CR-128) and the Astra criminal case (04-CR-774). (Tr. 46-47.)

Defendant makes four arguments for suppression of the items seized during the search, or in the alternative, for a *Franks* hearing: (i) the search warrant for the Astra premises was so lacking in the *indicia* of probable cause as to render reliance upon it unreasonable; (ii) the application for the warrant contained factual assertions which knowingly or recklessly misled the issuing judge; (iii) the warrant was facially deficient in that it sought authority for a general search in violation of the Fourth Amendment; and (iv) the seizure of items relating to Pescatore's personal and real estate businesses fell outside the scope of the warrant. All of Defendant's arguments are meritless. (Def.'s Mem. at 12-13.)

## A. *Applicable Law*

The Fourth Amendment to the U.S. Constitution provides, in pertinent part:

> [N]o warrants shall issue, but upon probable cause, supported by Oath or Affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Second Circuit has held that probable cause requires only a "probability or substantial chance of criminal activity, not an actual showing of such activity." *U.S. v. Bakhtiari*, 913 F.2d 1053, 1062 (2d Cir. 1990). Moreover, an issuing court's probable cause determination is entitled to substantial deference. *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983).

Even where a court determines that a warrant was not supported by probable cause, it is not required to suppress the evidence provided the officers

seized the items in good faith reliance on the defective warrant. *United States v. Leon*, 468 U.S. 897, 919-20 (1984). However, there are a number of circumstances where the good faith exception does not apply. Defendant argues that two such circumstances apply here: (1) that the instant warrant was so lacking in the *indicia* of probable cause as to render reliance upon it unreasonable because the warrant presented informants of no known reliability and included stale informant information; and (2) the warrant contained factual assertions which knowingly misled the issuing magistrate. (Def.'s Mem. at 12.)

B. *Indicia of Probable Cause*

1. Informant Reliability

Defendant correctly points out that Det. Petro did not give the names of the informants cited in the application and did not describe their role in the investigation. (Def.'s Mem at 15.) However, such information is not a prerequisite for a finding of informant reliability. "Even where an informant has no proven record, if an informant's declaration is corroborated in material respects, the entire account may be credited, including parts without corroboration." *U.S. v. Wagner*, 989 F.2d 69, 73 (2d Cir. 1993); *see also U.S. v. Gagnon*, 373 F.3d 230, 238 (2d Cir. 2004) (reversing district court's determination that warrant lacked probable cause in part because of district court's failure "to recognize the extent to which the information [the informant] provided was corroborated[.]") Here, the evidence presented in the application was largely derived from Det. Petro's careful examination of six vehicles which

he determined had been stolen, stripped, abandoned, recovered, auctioned, and purchased by Astra Motors. (Warrant Application ¶¶ 6-11.) Det. Petro's witness interviews were only a small part of the Astra investigation and were used primarily for corroboration. For instance, it appears that witnesses merely verified Det. Petro's conclusion, arrived at through examination of NYSDMV records, that Astra generated fraudulent paperwork.[5] (Warrant Application ¶ 8.)

2. Staleness

Defendant also argues that the warrant lacked probable cause because the information in the application was stale. In support of his contention, Defendant points out that Det. Petro inspected the vehicles years after they passed through Astra's hands and that he failed to include the dates informants acquired their information. (Def.'s Mem. at 15-16.)

The Second Circuit considers two factors in determining whether the information in a search warrant affidavit is stale: (1) the time elapsed between the criminal activity and the application for a warrant; and (2) the type of crime involved. *See United States v. Ortiz*, 143 F.3d 728, 732 (2d Cir. 1998). However, when the criminal conduct is ongoing, "the passage of time between the last described act and the presentation of the application becomes less significant." *United States v. Gallo*, 863 F.2d 185, 192 (2d Cir. 1988) (citations omitted).

---

[5] It is worth noting that even if this Court found the witness statements unreliable, which it does not, Det. Petro's detailed application would still present sufficient information to establish probable cause. *See U.S. v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998) ("If, after setting aside the allegedly misleading statements or omissions, the affidavit, nonetheless, presents sufficient information to support a finding of probable cause, the district court need not conduct a *Franks* hearing.")

Here, the search warrant, which was filed in 2003, indicated that the criminal activity had been ongoing since at least 2000. (Warrant Application ¶ 9.) Thus, this Court is not overly concerned with the amount of time that passed between the last criminal activity and the application for the warrant. In any event, this interval was quite short, as a mere week before applying for the warrant, Det. Petro observed an Astra employee bringing a 2002 Cadillac Escalade into a NYSDMV inspection station, purportedly on behalf of a man who had been dead for nine years. (Warrant Application ¶ 11.)

Furthermore, as noted above, the application's lack of specificity concerning the times Det. Petro spoke with the informants is not fatal because the informants were used for corroboration and Det. Petro had other grounds for making his application.

C. *Whether the Search Warrant Application Misled the Issuing Magistrate*

Defendant argues that he is entitled to a *Franks* hearing because the warrant application contained misleading factual assertions. A court will only order a *Franks* hearing if a Defendant can make a substantial preliminary showing that (1) the warrant affidavit contains a false statement, (2) the false statement was included intentionally or recklessly, and (3) the false statement was integral to the probable cause finding. *See Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). Defendant claims that Det. Petro made six misleading statements in the

application.[6]

        First, in regard to the 2002 Cadillac Escalade examined by Det. Petro, Defendant alleges that the Detective incorrectly asserted that it was an "Astra Motors employee" who brought the vehicle to the NYSDMV. However, it is clear that this individual was in fact an employee. (Def.'s Mem. at 17.) The Motor Vehicle Investigator who was present at the Cadillac's inspection reported that the individual who brought the car to the inspection station, "said he worked for Astra Motors" and called the owner of Astra Motors, Stanford Edmonston, numerous times during the inspection. (Gov. Mem. Opp., Ex. 1.) Second, Defendant argues that the fact that the car was presented with Astra Motor dealer plates does not indicate criminality because dealer plates are used in the ordinary course of business. (Def.'s Mem at 17.) Defendant is correct that dealer plates are not a sign of criminality; however, they are useful in showing a relationship between the car and Astra Motors and perfectly appropriate to include in the application. Third, Defendant asserts that there was no active alarm on the Cadillac, and instead the vehicle merely had a "title hold." (Adelman Decl. ¶ 46.) In response, the Government submitted the National Crime Information Center's report on which Det. Petro based his conclusion. This report clearly states that

---

[6] On January 2, 2006, Defendant submitted a late reply memorandum concerning these alleged factual statements (the "Jan. 2 Reply"). In the reply, Defendant claims that the Government has failed to turn over certain documents which are necessary to evaluate whether the warrant application contained misleading facts. While this Court is highly concerned with the Government's delayed production of documents, the numerous exhibits submitted to the Court by the Government, which Defendant has obviously been able to review, demonstrate that the issuing court was not misled.

the vehicle was stolen.[7]  (Gov. Response Def.'s Second Suppression Mot., ("Gov Resp. Suppression Mot.") Dec. 16, 2005., Ex. 6.)  Nowhere does this document indicate that the Cadillac had a title hold.  Thus, Det. Petro's assertions in regard to the Cadillac Escalade were not false and Defendant fails to meet the first prong of the *Franks* test.

Fourth, Defendant asserts that Det. Petro's statements concerning the first 1998 Infiniti I-30 were misleading.  According to the warrant application, Det. Petro observed that the dashboard, which had the VIN tag attached to it, had been removed from the vehicle. (Warrant Application ¶ 9.)  Defendant claims that this statement is untrue, relying on a copy of a Salvage Certificate which does not state that the VIN was missing or defaced. (Adelman Decl. ¶ 34.)  This statement is belied by a photograph taken by the insurance company showing that the entire dashboard was removed.[8] (Gov Resp. Suppression Mot., Ex. 1.)  Again, Defendant has failed even to show the existence of a misleading factual statement.

---

[7]  In his Jan. 2 reply, Defendant supplements his argument by stating that the Government has not produced documents proving the Cadillac was reassembled with stolen parts.  However, Det. Petro did not need such "proof" to establish probable cause.  Nor did he need to show that Astra *knew* the car contained stolen parts, as Defendant also argues.  Det. Petro only needed to show a "substantial chance of criminal activity." *U.S. v. Bakhtiari*, 913 F.2d 1053, 1062 (2d Cir. 1990).  By demonstrating that the Cadillac (i) had an active alarm, and (ii) was brought to the site with Astra dealer plates by an Astra employee, on behalf of an individual who had been deceased for nine years, Det. Petro clearly met this standard.

[8]  In his Jan. 2 reply, Defendant points to a complicated time-line showing the vehicle was sold and repurchased by Astra Motors after being bought by the company at auction.  However, this time-line does not cast any doubt on Det. Petro's assertion that there was probable cause to believe Astra had stolen parts in his possession when it initially purchased the car at auction. (Warrant Application ¶ 9.)

Fifth, Defendant alleges that Det. Petro made misleading factual assertions in reference to a second 1998 Infiniti I-30 purchased from Astra Motors by an individual named Danny Villagran. (Adelman Decl. ¶¶ 39-42.) Like the first I-30, this car was missing its entire interior, including the dashboard where the VIN tag attached, at the time it was purchased by Astra Motors in 2000. (Warrant Application ¶ 10.) When Det. Petro saw the vehicle in 2003, he observed that it had been completely reassembled. Defendant argues that Det. Petro's statements are misleading because he omitted Villagran's statement that he (Villagran) found the dashboard in the car and reinstalled it himself. (Adelman Decl. ¶¶ 39-42.) However, Villagram's statement is likely false. As the purchaser of the vehicle, he was in possession of stolen property and subject to arrest; thus, Villagran had reason to fabricate an alibi. Moreover, Det. Petro could not have included the conversation with Villagran in the application, because he spoke with Villagran *after* the warrant application was filed. Lastly, Villagran's explanation is highly unlikely because it would mean that Astra Motors never opened the trunk of the Infiniti when it reassembled the car after purchase. Det. Petro was obviously under no obligation to include such an unreliable statement in the application.

Sixth, Defendant contests Det. Petro's assertion that Astra Motors underreported the amount it owed in sales taxes. (Def.'s Mem. at 18-19.) Det. Petro based this conclusion on an investigation by the Tax Department which found that Astra Motors listed selling prices lower than the fair market value of

the vehicles, in some cases apparently listing a selling price of zero. (Warrant Application ¶ 12.) Defendant argues that because the vehicles it sold were wrecked, flooded, burned, stolen, and stripped, it would be impossible to know their fair market value. (Def.'s Mem. at 18.) However, Defendant fails to point to a specific false statement made by Det. Petro. Moreover, this Court notes that the Tax Department conducted its investigation appropriately, comparing the MV-50 forms filed by Astra Motors against the company's New York state sales tax returns.[9] (Gov Resp. Suppression Mot. at 9-10.) Accordingly, Judge Bergstrom was not misled and the warrant was supported by probable cause.

D. *Warrant Overbreadth*

Defendant argues that the warrant authorized a "general search" in violation of the Fourth Amendment because the language "in essence" gave the officers authority to seize "all car records and all business records." (Def.'s Mem. at 19 (emphasis in original.)) However, the language Defendant points to as authorizing a general search is actually quite particularized. For instance, Defendant cites language authorizing seizure of "parts and sales receipts for motor vehicle sales; computer equipment that could be sued [sic] to store DMV documents or parts and sales receipts . . . ." (Def.'s Mem. ¶ 20.) Such language is

---

[9]  In his Jan. 2 Reply, Defendant argues that the warrant application was flawed because it did not mention an examination by the Tax Department, which compared Astra Motors' tax returns to the MV-50 forms and found that the documents listed different sales for the same vehicles. However, Det. Petro need not have referenced the examination to establish probable cause. Probable cause was properly established by showing that Defendant listed sales prices far below market price. The fact that Det. Petro's statements were later corroborated by Defendant's sales tax returns clearly does not show that the issuing court's probable cause determination was erroneous.

certainly more particularized than the language in a warrant application the Supreme Court upheld, which authorized the seizure of *inter alia* "books, records, documents, papers, memoranda and correspondence" relating to a fraudulent transaction. *See United States v. Andresen*, 427 U.S. 463, 480 n.10 (1976).

Moreover, even if the warrant authorized the seizure of all records, as Defendant contends, it would still be valid. The Second Circuit has repeatedly held that all records of a business may be seized when the business is "permeated with fraud." *National City Trading*, 635 F.2d 1020, 1026 (2d Cir. 1980); *see also United States Postal Service v. C.E.C. Services*, 869 F.2d 184, 187 (2d Cir. 1989). Here, the indictment in the Astra criminal case alleges that all Defendants "conspired to devise and implement a scheme to defraud insurance companies and motor vehicle purchasers of money and property . . . ." (Lefcourt Decl., Ex. B at 11.) More specifically, certain Defendants are charged with nineteen (19) counts of mail fraud. (Lefcourt Decl., Ex. B at 20-24.) Once the nature of the crime is considered, it becomes obvious that the warrant was actually narrow in scope.

E. *Whether Officers Exceeded the Scope of the Warrant*

During oral argument, the Defendant argued at length that the officers exceeded the scope of the warrant by seizing his personal records and real estate business records which were "clearly marked" as such. (Tr. at 24.) As this Court repeatedly made clear during argument, officers were authorized to seize the "proceeds of the crime", including any proceeds Pescatore invested in his real

28

estate ventures.[10] (Warrant Application ¶¶ 2, 4; Tr. at 37, 39, 45.)  Because the real estate records were derived from Pescatore's investment of the Astra Motors' proceeds, they were subject to seizure. (Tr. at 41.)  Furthermore, the warrant authorized officers to seize Pescatore's personal records because these documents demonstrated the Defendant's "ownership and control of the premises." (Warrant Application ¶ 4.)

In any event, the fact that the documents were in files that were "clearly marked" as real estate or personal records does not protect them from seizure.  "In any thorough search for documents, even seemingly innocuous records must be examined to determine whether they fall with the category of items covered by the warrant . . . . Few people keep documents of their criminal transactions in a folder marked crime records." *U.S. v. Triumph Capital Group, Inc.*, 211 F.R.D. 31, 63 (D. Conn. 2002) (citations omitted).

Defendant also argues that officers exceeded the scope of the warrant by searching a second floor office on the premises, which he claims contained only documents relating to real estate ventures. (Def.'s Mem. at 24.)  In essence, Defendant claims that the office was a separate residence from Astra Motors.  The Second Circuit has held that "[f]actors that indicate a separate residence include separate access from the outside, separate doorbells, and

---

[10]  In his Jan. 2, reply, Defendant cites paragraph four (4) of the warrant application to argue that officers' authorization to seize "proceeds of the crime" is limited to proceeds which show "ownership and control of the premises." (Jan. 2 Reply at 2.)  Defendant neglects to discuss paragraph two (2) of the application which authorizes seizure of any property which "constitutes proceeds of a crime", and contains no such limitation.

separate mailboxes." *See United States v. Kyles*, 40 F.3d 519, 523 (2d Cir. 1994).

None of these factors were present here. Furthermore, photographs submitted by

the Government show that there was no conspicuous sign indicating that a

separate business was located in the building. (Gov. Mem. Opp., Ex. 6, 7.)

Lastly, the search warrant authorized officers to search "inside the building and

yard of Astra Motors" and in no way limited the search to the first floor.

As this Court has determined that the search of Astra Motors was

conducted lawfully and the search warrant was supported by probable cause, it

need not address Defendant's arguments that certain items must be excluded as a

result of an unlawful search or seizure.

### III.  Severance

Defendant makes a number of arguments for severance of certain

counts in the indictment pursuant to Rules 8 and 14.  Some of Defendant's

arguments have become academic because the counts involving Defendant's co-

conspirator, Byron Chavis, have been effectively severed.  Defendant's remaining

arguments are (i) that the counts charging both the Defendant and Byron Chavis

should be severed from the counts charging only the Defendant, and (ii) that the

counts charging Defendant with committing extortion against contractors working

on his house should be severed from counts charging Defendant with committing

extortion against the landlord of one of his business properties. (Def.'s Mem. 26-

28; Tr. 6.)  This Court finds these arguments meritless.

Rule 8(a) sets forth a "liberal standard for joinder." *United States v. McGrath*, 558 F.2d 1102, 1106 (2d Cir. 1977). The Rule states that an indictment may charge the same defendant in separate counts if the counts "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." The Second Circuit has interpreted this provision to mean the offenses must be "somewhat alike" *United States v. Werner*, 620 F.2d 922, 926 (2d Cir. 1980) or have a "sufficient logical connection" to one another. *United States v. Ruiz*, 894 F.2d 501, 505 (2d Cir. 1990).

Here, there is no doubt that the counts have the requisite connection. All counts involve the same crime, extortion, by the same individual, the Defendant. Moreover, all of the Defendant's extortions involve the same *modus operandi* - an attempt to resolve business disputes by violence or threat of violence. (Gov. Mem. Opp. at 29.) In each extortion, Pescatore entered a business relationship with the alleged victim. A dispute over the amount of payment resulted and Pescatore then threatened violence. *See supra* pp. 10-12. Using the "common sense approach" endorsed by the Second Circuit, "a reasonable person would easily recognize the common factual elements that permit joinder." *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003) (quoting *United States v. Turoff*, 853 F.2d 1037, 1044 (2d Cir. 1988).

The distinctions which the Defendant attempts to draw between the various counts are inconsequential. It is immaterial for purposes of this analysis

that some counts allege that Defendant acted in concert with Chavis while others allege that Defendant acted with unnamed associates. It is similarly irrelevant that three of the victims worked on Defendant's house while another leased him property. Indeed, Defendant can point to no case showing where such minor distinctions resulted in severance. The case Defendant does cite to, *United States v. Tubol*, 191 F.3d 88 (2d Cir. 1999) is inapposite. In *Tubol*, the Defendant was charged with the robbery of a number of banks. The Second Circuit upheld the District Court's decision to sever the robbery counts primarily because the *methods* used by the Defendant in committing the robberies were easily distinguishable. *Id.* at 94-95. As described above, Pescatore's method of committing the extortion was the same in all cases. Thus, the Defendant's argument fails and joinder is proper under Rule 8(a).

Defendant also argues that severance is necessary because joinder would prejudice him under Rule 14. A defendant must meet a high standard to show Rule 14 prejudice. *See United States v. Walker*, 142 F.3d 103, 110 (2d Cir. 1998) (holding that the prejudice must be "sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials."); *see also United States v. Amato*, 15 F.3d 230, 237 (2d Cir. 1994) (citations omitted) ("Given the balance struck by Rule 8, which authorizes some prejudice against a defendant, a defendant who seeks separate trials under Rule 14 carries a heavy burden of showing that joinder will result in substantial prejudice.")

Defendant Pescatore has clearly failed to meet this burden. After severance of the charges against Chavis, Defendant's remaining argument is that he would face prejudice because of the number of counts against him. However, Defendant is charged with only six counts and cites to no case law supporting his argument that this relatively small number of charges is prejudicial. Accordingly, Defendant's motion for severance under Rule 14 is denied.

### IV. Bill of Particulars and Discovery Requests

Defendant demands a bill of particulars in this case, and requests the Government (i) provide the identity of all co-conspirators, (ii) set forth the date, time, and location of each alleged act of extortion, (iii) as to each act, set forth the nature of the threat and the manner it which it was communicated, (iv) state whether the defendant acted as a principal or aider and abettor as to each alleged extortionate act. (Def.'s Mem. at 31.)

Defendant's request for a bill of particulars is without merit. The Government is under no obligation to supply such detailed information. *See United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (holding that a bill of particulars should not be used to provide the defendant with "evidentiary detail" about the Government's case). Moreover, Defendant has already received a great deal of information through the discovery process including documents, records, and photographs.

In regard to discovery, Defendant requests the Government: (i) provide witness lists, (ii) provide statements of the co-defendant, and (iii) return all property seized during the search of Astra Motors. (Def.'s Mem. at 32-33).

On January 3, 2006, this Court entered an Order in the Astra criminal case, which ruled that the Government must turn over to the Astra defendants either originals or copies of all documents seized during the search. This Court reaffirms that ruling in this case and hereby orders the Government to turn over all such documents to the Defendant prior to the start of his trial, set for January 17, 2006. Defendants remaining discovery requests are hereby denied.

**CONCLUSION**

Accordingly, this Court:

(a) **DENIES** Defendant's motion to reassign this case to another court;

(b) **DENIES** Defendant's motion for recusal based on the Court's spouse's stock ownership;

(c) **DENIES** Defendant's motion to suppress evidence seized from the search of the Astra Motors premises;

(d) **DENIES** Defendant's motion to sever certain counts of the indictment pursuant to Rules 8(a) and 14;

(e) **DENIES** Defendant's motion for a bill of particulars;

(f) **DENIES in part and GRANTS in part** Defendant's discovery requests.

**SO ORDERED**.

/S/_____

Thomas C. Platt, U.S.D.J.

Dated: Central Islip, New York

January 5, 2006